UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

ASHRAF MUSTAFA,

                Plaintiff,

v.

FORD MOTOR COMPANY,

                Defendant.

Case No. 22-cv-11902
Hon.  Terrence G. Berg
Mag. Judge Anthony P. Patti

| ERIC STEMPIEN (P58703) | JESENKA MRDJENOVIC (P82587) |
|---|---|
| STEMPIEN LAW, PLLC | GIBSON, DUNN & CRUTCHER LLP |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 38701 Seven Mile Rd, Suite 130 | 1050 Connecticut Avenue, NW |
| Livonia, MI 48152 | Washington, DC  20036-5306 |
| (734)744-7002 | (202) 887-3660 |
| eric@stempien.com | Jmrdjenovic@gibsondunn.com |

## **PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff, Ashraf Mustafa, by and through his attorneys, Stempien Law, PLLC, hereby complains against Defendant Ford Motor Company and in support thereof states:

1. Plaintiff Ashraf Mustafa ("Mustafa" or "Plaintiff") is a resident of the City of Dearborn, Wayne County, Michigan.

2. Defendant Ford Motor Company ("Ford" or "Defendant") is a foreign corporation with its principal place of business located in Wayne County, Michigan.

1

3. The events giving rise to this action occurred within the Eastern District of Michigan.

4. Jurisdiction is vested with this Court pursuant to 28 USC §1331 and 42 USC §2000e, et. seq.

5. On or about May 17, 2022, Mustafa filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6. On or about May 18, 2022, the EEOC issued a Dismissal and Notice of Rights letter to Mustafa for his Charge for Discrimination.

## GENERAL ALLEGATIONS

7. Mustafa is of Middle Eastern race and Middle Eastern national origin.

8. Mustafa's religion is Islam.

9. Mustafa began his employment with Ford in October 2014.

10. Mustafa was employed by Ford as a Manufacturing Engineer from his date of hire until his discharge on or about July 22, 2021.

11. In 2019, Mustafa was assigned to a team that was managed by Daniel Schluentz ("Schluentz").

12. The team to which Mustafa was assigned in 2019 was managing the launch of the 2022 Ford F-150 pickup truck at Ford's assembly plant located near Kansas City, Missouri.

13. Mustafa's direct supervisors on the Kansas City launch team were Gordon Richei ("Richei") and Victoria Wilson ("Wilson").

14. Prior to his assignment to the Kansas City launch team, Mustafa received yearly performance reviews with high ratings and strong, positive comments.

15. While assigned to the Kansas City launch team however, and under the supervision of Schluentz, Richei and Wilson, Mustafa received extremely low performance evaluations and multiple disciplines for alleged poor performance.

16. During this same time that Mustafa was rated as a poor performer by Schluentz, Richei and Wilson, Mustafa was assigned to several outside, temporary projects; at those temporary projects, Mustafa received praise for his excellent work and ability to problem solve.

17. In or about May 2020, Mustafa came to his work location wearing shorts, just as several of his white co-workers had done over the prior few weeks; when Richei saw Mustafa's shorts, he reprimanded him.

18. In the prior weeks when Mustafa's white co-workers came to meetings with Richei in shorts, Richei made no comment to them.

19. The interaction with Richei upset Mustafa to the point where he mentioned it to one of his co-workers, Eric Crowley ("Crowley").

20. Crowley repeated to other workers on the team that Mustafa had been reprimanded for wearing shorts; almost immediately thereafter, Crowley was fired from his position with Ford.

21. In July 2020, one of the engineers on Mustafa's team quit his position; many of the departed engineer's job duties were transferred to Mustafa.

22. Mustafa's specific job duty for the team was performing the manufacturing engineering work for the manufacture and installation of the instrument panel for the 2022 Ford F-150 pickup truck.

23. The team also consisted of manufacturing engineers for other parts of the launch, including electrical, powertrain and chassis.

24. Because the instrument panel is connected to the electrical system, the powertrain and the chassis, there is significant crossover work between those particular engineering jobs.

25. For example, while the instrument panel was being manufactured or installed, there might be the discovery of a problem with the electrical system; this would require that the engineer assigned to the electrical sub-system to address that problem even though it occurred during the manufacture or installation of the instrument panel.

26. Despite this requirement, Mustafa's supervisors expected Mustafa to address all problems or issues that arose during the manufacture or installation of the instrument panel, even when it did not involve his sub-system.

27. Mustafa always agreed to take on that extra work, however, in the summer and fall of 2020 it became clear to him that he required assistance with the job due in part to the physical distance between the various production lines.

28. Mustafa made a request to Richei that another engineer be assigned to assist him.

29. Richei failed to provide Mustafa any assistance.

30. In October 2020, Richei's and Schluentz' manager, Candace Glasgow, assigned a young engineer, Benjamin Schwieterman ("Schwieterman") to assist Mustafa.

31. When Schwieterman arrived at the Kansas City assembly plant, Richei held a meeting with the team and announced that he was assigning Schwieterman to assist another engineer, Jeff Bearly.

32. One of the team members, Luree Brown, interrupted Richei and told him that Schwieterman had been sent to Kansas City specifically to assist Mustafa; Richei responded by stating that they "would talk about it later".

33. Schwieterman was never assigned to assist Mustafa.

34. After the assignment of Schwieterman to Jeff Bearly, it became clear to Mustafa that he was being set up by Schluentz, Richei and Wilson to fail; he had been given more work than it was physically possible to complete and when the superiors recognized that fact and tried to provide assistance, that assistance was denied by Mustafa's supervisors.

35. On or about October 9, 2020, Mustafa filed a formal complaint with Ford's human resources department; Mustafa complained that he had suffered illegal discrimination and harassment by his supervisors.

36. Following Mustafa's report to human resources, Richei accused Mustafa of falsifying his timecard.

37. The timecard issue was investigated by Ford's human resources representative, Suzie Furton, who found no merit to Richei's accusation.

38. In December 2020, Mustafa received his annual performance review from his supervisors; the review stated that Mustafa had met and completed all of his deliverables for 2020, he was rated as a poor performer based upon the specious argument that the deliverables were all met only because of the work of his other team members.

39. In January 2021, Mustafa was placed on a medical leave of absence due to an injury that he suffered on the job in October 2020.

40. Mustafa returned to work on July 19, 2021 after having been cleared to return by both his own physician as well as Ford's medical team.

41. On the same day as his return to work, Mustafa received a meeting invitation to meet with Wilson and Schluentz on July 22, 2021.

42. At that meeting on July 22, 2021 Ford fired Mustafa from his manufacturing engineer position.

43. The stated reason for Mustafa's discharge was poor performance, however, that reason was false; Mustafa performed his position well and managed to meet all of his deliverables for 2020 despite having been asked to perform work beyond his sub-system, having had to work on projects that were not within his job duties and despite having been actively sabotaged by his managers.

44. Schluentz, Richei and Wilson were all decision-makers with regard to Defendant's decision to discharge Plaintiff from his employment with Ford.

**<u>COUNT I</u>**
**<u>VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT</u>**
**<u>RACE, NATIONAL ORIGIN AND RELIGION DISCRIMINATION</u>**

45. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

46. Title VII of the Civil Rights Act of 1964 ("Title VII"), specifically 42 USC

§2000e-2 provides that "it shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his

compensation, terms, conditions or privileges of employment because of such individual's race…religion… or national origin."

47. Plaintiff was an employee of Ford as that term is defined by Title VII.

48. Defendant was Plaintiff's employer as that term is defined by Title VII.

49. Plaintiff is a member of a protected class based on his Middle Eastern race.

50. Plaintiff is a member of a protected class based on his Middle Eastern national origin.

51. Plaintiff is a member of a protected class based on his Muslim religion.

52. Plaintiff was qualified for his position as manufacturing engineer as evidenced by his strong performance reviews over the six years that he worked at Ford prior to his assignment to the Kansas City launch team.

53. Plaintiff suffered adverse employment actions, including performance improvement plans, reprimands and discharge.

54. The Defendant's stated reasons for the adverse employment actions taken against Plaintiff were false.

55. The Defendant's stated reasons for the adverse employment actions taken against Plaintiff were pretext for discrimination.

56. Plaintiff was replaced by a person who was non-Middle Eastern and non-Muslim.

57. Other, non-Middle Eastern and non-Muslim employees at Ford, who were similarly situated to Plaintiff, were not subjected to the same adverse employment actions as Plaintiff, including but not limited to:

   a. Other, non-Middle Eastern, non-Muslim, engineers who were employed on the Kansas City launch team, with similar job titles, job duties and the same supervisors, were assigned, by Defendant Ford, assisting engineers to help them complete their job duties, some similarly situated co-workers had two assisting engineers; when Ford executives in Michigan assigned an assisting engineer to Plaintiff due to his incredibly high workload, the same supervisors never allowed that person to assist Plaintiff, instead that assisting engineer was assigned to a white, non-Muslim engineer on the launch team.

   b. Other, non-Middle Eastern, non-Muslim engineers who were employed on the Kansas City launch team, with similar job titles, job duties and the same supervisors, were given credit and received commensurate performance reviews for the work that they performed; when those same supervisors judged Plaintiff's work in 2020, they acknowledged that he had successfully completed all of his objectives, but still rated him poorly because they credited Plaintiff's white, non-Muslim co-workers for his accomplishment of objectives; this 2020 performance review was a key basis for Defendant's decision to discharge Plaintiff.

   c. Other, non-Middle Eastern, non-Muslim engineers who were employed on the Kansas City launch team, with similar job titles, job duties and the same supervisors, were not given poor performance reviews when they met all of their yearly objectives; instead, they were recognized for their work and given raises and other accolades; when Plaintiff met all of his objectives for 2019, he was given a poor performance review which was then used to discharge him from his employment.

   d. Other, non-Middle Eastern, non-Muslim engineers who were employed on the Kansas City launch team, with similar job titles,

      job duties and the same supervisors, were allowed to dress however they pleased at work including wearing shorts, but Plaintiff was reprimanded for wearing shorts to work on a hot day.

e. Other, non-Middle Eastern, non-Muslim engineers who were employed on the Kansas City launch team, with similar job titles, job duties and the same supervisors, were provided assistance when their workload was increased; when Plaintiff had a significant increase in workload he requested assistance, but those same supervisors refused to provide him with any assistance.

f. Other, non-Middle Eastern, non-Muslim engineers who were employed on the Kansas City launch team, with similar job titles, job duties and the same supervisors, were not given the work duties of the engineer who quit his job on the launch team; Plaintiff was given all of the work duties of the engineer who quit.

58. Plaintiff was discharged because of his race.

59. Plaintiff was discharged because of his national origin.

60. Plaintiff was discharged because of his religion.

61. As a direct and proximate result of Defendant's violations of Title VII of the Civil Rights Act, Plaintiff suffered damages, including but not limited to: lost past and future wages, lost past and future employment benefits; loss of earning capacity and emotional distress.

## COUNT II
## VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT
## RETALIATION

62. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

63. As more fully stated above, Mustafa exercised a right that was afforded to him by Title VII of the Civil Rights Act of 1964.

64. Plaintiff engaged in protected activity, as that term is defined by Title VII of the Civil Rights Act, by opposing violations of Title VII.

65. Ford discharged and otherwise discriminated against Mustafa for his exercise of a right afforded to him by Title VII in violation of 42 USC §2000e-3.

66. In retaliation for Plaintiff's protected activity, Richei falsely accused Plaintiff of time-card fraud, this accusation occurred within two work weeks of Plaintiff's complaint to Ford's human resources.

67. Further, Ford's reasons for Plaintiff's discharge are demonstrably false; Plaintiff did not have poor performance; his supervisors rated him poorly despite the fact that he accomplished his objectives, particularly for the 2020 performance review, which was a key basis for Plaintiff's discharge.

68. Other, similarly situated engineers at Ford, who did not engage in protected activity, did not receive poor job performance scores when they met their objectives, and their performance scores were not used as a basis for discharge.

69. As a direct and proximate result of Defendant's violation of 42 USC §2000e-3, Plaintiff suffered damages as fully set forth in paragraph 61 above.

## JURY DEMAND

Plaintiff Ashraf Mustafa hereby demands a trial by jury of the within cause.


STEMPIEN LAW, PLLC


*/s/ Eric Stempien*
By: Eric Stempien (P58703)
Attorney for Plaintiff

Dated: October 9, 2023